UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| YURIY SOTNIKOV and MAYA SOTNIKOVA, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.4:24-cv-00902-SRC |
| DEPARTMENT OF HOMELAND SECURITY et al., | ) ) ) | |
| Defendants. | ) ) | |

**Memorandum and Order**

Under federal law, children of naturalized citizens automatically become United States citizens if they satisfy a few conditions: 1) they are under the age of 18, 2) they are residing in the United States pursuant to a lawful admission for permanent residence, and 3) they are in the legal and physical custody of the citizen parent. Other children, those living outside of the United States, who are under the age of 18 may derive citizenship from their naturalized parent but they must apply to do so.

In October 2001, Maya Sotnikova became a naturalized United States citizen. By then, her son, Yuriy Sotnikov, was over the age of 18 and could not avail himself of the statutes that may have allowed him to derive United States citizenship from his mother. So, he remained a lawful permanent resident until he was removed to Russia in 2004 because he was an aggravated felon under the Immigration and Nationality Act.

Now—two decades later, while he's still in Russia—Sotnikova and Sotnikov seek an order compelling Defendants to issue Sotnikov a certificate of United States citizenship. Defendants move to dismiss, arguing that the Court lacks the power to grant the relief they seek

and, in the alternative, that they have failed to state a claim upon which the Court can grant relief. The Court addresses these arguments below.

I.      **Background**

      **A.      Factual background**

The Court accepts the following well-pleaded facts as true for purposes of resolving Defendants' motion to dismiss.

In August 1995, the United States admitted Sotnikova, her husband, and Sotnikov into the United States as Russian refugees. Doc. 1 at ¶ 49. The family became lawful permanent residents a couple years later. *Id.* at ¶ 50. Then, in July 2000, Sotnikova filed a naturalization application and notified the Immigration and Naturalization Service. *Id.* at ¶ 51. She intended to file a certificate-of-citizenship application on behalf of Sotnikov as soon as she was naturalized. *Id.* INS then completed background checks on Sotnikova and captured her fingerprints. *See id.* at ¶ 52.

INS continued reviewing Sotnikova's application, including by conducting an interview of Sotnikova on February 7, 2001. *Id.* at ¶ 53. During the interview, Sotnikova told the INS officer that Sotnikov would turn 18 years old in July 2001. *See id.* at ¶ 54. The INS officer expressed that Sotnikova's case would be expedited per INS policy to avoid Sotnikov aging out of derivative-citizenship eligibility. *See id.* At that time, the INS had a policy to "instruct[] its field offices to adjudicate an application to determine eligibility for any derivative children soon to reach the age of [18] in less than" 60 days. *Id.* at ¶ 55 (emphasis omitted).

Two days after this interview, a Missouri state court convicted Sotnikov of second-degree assault, a felony, and third-degree assault, a misdemeanor. *Id.* at ¶ 59. He served a sentence of

120 days in custody for the third-degree assault conviction and received a suspended execution of sentence for five years for the second-degree assault conviction.  *Id.*

On February 12, 2001, Sotnikova went to the INS office, where she informed an INS officer that naturalizing Sotnikov was urgent and begged INS to expedite her naturalization ceremony.  *Id.* at ¶ 62.  The INS officer assured Sotnikova that the officer would deliver the information to the appropriate INS officer and that INS would expedite the case in light of Sotnikov's upcoming 18th birthday.  *Id.* at ¶¶ 11, 62.  The INS officer also told Sotnikova that the INS office had not made a decision on her application.  *Id.* at ¶ 95; doc. 1-5 at ¶ 7.

Following Sotnikova's visit, an INS officer made a handwritten note on a document related to Sotnikova.  Doc. 1-7 at 2 (The Court cites to page numbers as assigned by CM/ECF.).  The top half of the document contains printed information, including a date (February 12, 2001) and a portion for information regarding a naturalization date.  *Id.*  The naturalization-date portion lacks any information.  *Id.*  The bottom half of the document has the handwritten information, which states that:

> Jill has this file.
> She is scheduled to be naturalized and she would like her 17 year old son to ride on her naturalization before he turns 18.  (████████83)  He is currently in jail serving time on an Assault 2 (Felony) conviction and Assault 3 (Misd).  He is scheduled to be released on May 8, 2001.  This kind has been in a few "incidents" before but this is his 1st conviction.

*Id.*; *see* doc. 1 at ¶ 11.  Neither the complaint nor the document identifies the date that this handwritten note was added or who made the note.  *See* doc. 1; doc. 1-7 at 2.  But the handwritten note refers to the conversation that Sotnikova had with the INS officer when she visited the INS office on February 12, 2001.  Doc. 1 at ¶ 63.

On an unknown day, Sotnikova, through her former attorney, sent a written request to the then St. Louis Field Office director, asking him to expedite her case proceedings in light of

Sotnikov's upcoming 18th birthday. *Id.* at ¶ 65. The attorney also called the office and discussed the urgency of the situation. *Id.* The INS office assured Sotnikova's attorney that Sotnikova's oath ceremony would be expedited and that Sotnikova would be naturalized before Sotnikov's birthday. *Id.*

The United States Customs and Immigration Service's (USCIS), which replaced INS in 2003, 6 U.S.C. § 271(b), case-status online tool states that, on May 2, 2001, Sotnikova's file was transferred to a local office to have a second interview scheduled, *id.* at ¶ 66. But no one documented this transfer in Sotnikova's file. *Id.*

Despite Sotnikova's pleas to resolve her case before Sotnikov's 18th birthday, the INS office did not approve her application until July 31, 2001, eight days after Sotnikov's birthday. *Id.* at ¶ 13. Two days after it approved Sotnikova's application, INS requested a copy of Sotnikov's criminal file from St. Louis County Court, which the court provided. *Id.* at ¶ 75; doc. 1-9 at 4. Then, in September 2001, Sotnikova was scheduled for an oath ceremony on October 19, 2001. Doc. 1 at ¶ 77. Sotnikova took the oath of citizenship on October 19, 2001, and on that date became a United States citizen. *See id.*; doc. 1-5 at ¶ 2.

Fast forward several years. In 2004, and possibly 2005, Sotnikov was involved in criminal conduct that resulted in him pleading guilty on two different occasions. *See* doc. 1-11 at 5. First, on April 25, 2005, Sotnikov pleaded guilty in Missouri state court to theft, a felony. Doc. 1 at ¶ 17; doc. 1-11 at 5. The presiding judge sentenced Sotnikov to five years of imprisonment but suspended the execution of the sentence and imposed 90 days of shock incarceration. Doc. 1 at ¶ 17. Then, on May 23, 2005, Sotnikov pleaded guilty in Missouri state court to attempted burglary—a felony—and was sentenced to four years of imprisonment. *Id.* at ¶ 18; doc. 1-11 at 5. Sotnikov completed the 90-day shock incarceration, and was released on

August 30, 2005, into the custody of ICE and placed in removal proceedings.  Doc. 1 at ¶ 19.

A month later, in October 2005, an immigration judge ordered Sotnikov removed from the

United States.  *Id.* at ¶ 79.  At an unspecified time, Sotnikov was removed pursuant to that order

and has since lived in Russia.  *Id.* at ¶¶ 20, 79.

Several years later, Sotnikova and Sotnikov filed a FOIA request seeking a copy of their

"Alien File."  *Id.* at ¶ 21.  In July 2022, Sotnikov filed an application for a United States

citizenship certificate.  *Id.* at ¶ 80.  The USCIS denied his application, explaining that Sotnikov

"did not meet the statutory requirements of eligibility for derivative citizenship under

Section 320 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1431."  *Id.* at ¶ 81.

Sotnikov appealed, *id.* at ¶ 82, but the Administrative Appeals Office dismissed the appeal, *id.*

at ¶ 83.  The Administrative Appeals Office explained that Sotnikov was statutorily ineligible for

derivative citizenship and that it could not address or adjudicate his request on equitable-relief

grounds.  *Id.*

## II.    Standard

### A.    Federal Rule of Civil Procedure 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss for lack of

subject-matter jurisdiction.  *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016)

("Federal jurisdiction is limited by Article III of the Constitution to cases or controversies; if a

plaintiff lacks standing to sue, the district court has no subject-matter jurisdiction."  (quoting

*ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 958 (8th Cir. 2001)).  The

plaintiff bears the burden of establishing that subject-matter jurisdiction exists.  *Herden v. United

States*, 726 F.3d 1042, 1046 (8th Cir. 2013) (en banc).  "Because of the 'unique nature of the

jurisdictional question,' it is the court's duty to 'decide the jurisdictional issue, not simply rule

that there is or is not enough evidence to have a trial on the issue.'" *Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019) (quoting *Osborn v. United States*, 918 F.2d 724, 729–30 (8th Cir. 1990)). "[T]he district court must distinguish between a facial attack—where it looks only to the face of the pleadings—and a factual attack—where it may consider matters outside the pleadings." *Croyle v. United States*, 908 F.3d 377, 380 (8th Cir. 2018) (citing *Osborn*, 918 F.2d at 729 n.6).

Where, as here, a party brings a facial attack, "the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Carlsen*, 833 F.3d at 908 (quoting *Osborn*, 918 F.2d at 729 n.6). In other words, the court "accept[s] as true all facts alleged in the complaint" and "consider[s] only the materials that are 'necessarily embraced by the pleadings and exhibits attached to the complaint.'" *Id.* (first quoting *Trooien v. Mansour*, 608 F.3d 1020, 1026 (8th Cir. 2010); and then quoting *Cox v. Mortg. Elec. Registration Sys., Inc.*, 685 F.3d 663, 668 (8th Cir. 2012)). "The plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right." *Stalley v. Cath. Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–57 (2007)).

### B.    Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted." The notice pleading standard of Rule 8(a)(2) requires a plaintiff to give "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To meet this standard and to survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  This requirement of facial plausibility means the factual content of the plaintiff's allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).  The Court must grant all reasonable inferences in favor of the nonmoving party. *Lustgraaf v. Behrens*, 619 F.3d 867, 872–73 (8th Cir. 2010).  Ordinarily, the Court considers only the facts alleged in the complaint when ruling on a motion to dismiss; however, the Court may consider materials attached to the complaint in construing the complaint's sufficiency. *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011).

When ruling on a motion to dismiss, a court "must liberally construe a complaint in favor of the plaintiff." *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010).  However, if a claim fails to allege one of the elements necessary to recover on a legal theory, the Court must dismiss that claim for failure to state a claim upon which relief can be granted. *See Delker v. MasterCard Int'l, Inc.*, 21 F.4th 1019, 1024 (8th Cir. 2022) (citing *Twombly*, 550 U.S. at 562).  Threadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.  Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79.  "A pleading that merely pleads 'labels and conclusions,' or a 'formulaic recitation' of the elements of a cause of action, or 'naked assertions' devoid of factual enhancement will not suffice." *Hamilton v. Palm*, 621 F.3d 816, 817–18 (8th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).  Although courts must accept all factual

7

allegations as true, they are not bound to take as true a legal conclusion couched as a factual allegation. *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 677–78.

Only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 679. Therefore, the Court must determine if the well-pleaded factual allegations "plausibly give rise to an entitlement to relief." *Id*. This "context-specific task" requires the Court to "draw on its judicial experience and common sense." *Id*. In determining the plausibility of a plaintiff's claim, *Iqbal* and *Twombly* instruct the Court to consider whether "obvious alternative explanations" exist for the allegedly unconstitutional conduct. *Id.* at 682; *Twombly*, 550 U.S. at 567. The Court must then determine whether the plaintiff plausibly alleges a violation of the law. *Iqbal*, 556 U.S. at 682. The well-pleaded facts must permit more than the "mere possibility of misconduct." *Id.* at 679. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 557).

## III.    Discussion

The United States Constitution confers on Congress exclusive constitutional authority over naturalization: "The Congress shall have Power . . . [t]o establish an uniform Rule of Naturalization . . . ." U.S. Const. art. I, § 8, cl. 4. Exercising this exclusive authority, Congress enacted the INA in 1952, which it has since amended numerous times. In 2001 and 2002, the INA contained provisions that specified how someone over the age of 18 could become a citizen through naturalization, 8 U.S.C. § 1427 (1996), and how a child born outside the United States could become a citizen through derivative citizenship, 8 U.S.C. § 1431 (2000); 8 U.S.C. § 1433 (2000).

In this case, Sotnikova and Sotnikov assert that Sotnikov has a right to derivative citizenship under the INA. *See* doc. 1. In doing so, they raise mandamus, Administrative Procedure Act, due-process, and equal-protection claims. *See id.* For relief, they ask the Court to "[o]rder Defendants to issue [Sotnikov's] Certificate of Naturalization within 30 days of the Court's favorable decision on [his] request for equitable relief." *Id.* at 41. Defendants move to dismiss all claims under Rules 12(b)(1) and 12(b)(6). Doc. 10. Below, the Court considers the motion as to each claim.

## A.    The APA and mandamus claims

In count one, Sotnikov raises a mandamus claim under 28 U.S.C. § 1361, arguing that "Defendants had a nondiscretionary duty to adjudicate Mrs. Sotnikova's Application giving rise to [Sotnikov's] derivative citizenship status." Doc. 1 at ¶ 131–34 (emphasis omitted). Sotnikova and Sotnikov assert in count two an APA claim on the same grounds. *Id.* at ¶¶ 135–41.

Under the Administrative Procedure Act, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof." 5 U.S.C. § 702. The reviewing court must "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside" certain "agency action, findings, and conclusions." 5 U.S.C. § 706(1)–(2) (detailing six categories of findings and conclusions that a court must hold unlawful and set aside). Thus, the Act provides "limited authority . . . to review whether agency action has been 'unlawfully withheld or unreasonably delayed.'" *Org. for Competitive Mkts. v. U.S. Dep't of Agric.*, 912 F.3d 455, 461–62 (8th Cir. 2018) (quoting 5 U.S.C. § 706(1)). Though "an agency's mere failure to act is usually not a final agency action triggering judicial review," *id.* at 462, "a claim under § 706(1) should be reviewed

as a petition for a writ of mandamus," *id.* (citing *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984)).

Similarly, under the Mandamus Act, a reviewing court may "compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.  The court may grant this relief "only in extraordinary situations and only if: (1) the petitioner can establish a clear and indisputable right to the relief sought, (2) the defendant has a nondiscretionary duty to honor that right, and (3) the petitioner has no other adequate remedy."  *Castillo v. Ridge*, 445 F.3d 1057, 1060–61 (8th Cir. 2006) (citation omitted). "The standard for undue delay under the Mandamus Act . . . is identical to the APA standard." *Kangarloo v. Pompeo*, 480 F. Supp. 3d 134, 142 (D.D.C. 2020) (citing *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–64 (2004)); *see Mohammad v. Blinken*, 548 F. Supp. 3d 159, 164–65 (D.D.C. 2021) (quoting *Kangarloo*, 480 F. Supp. 3d at 142).

As alleged, the APA and mandamus claims in this case assert that Sotnikov has a right to United States citizenship based on the derivative-citizenship statutes.  *See* doc. 1 at ¶¶ 131–41. In 2001, the INA contained two derivative-citizenship statutes that could have provided children with derivative citizenship.

First, 8 U.S.C. § 1431 provided that if a child born outside the United States was residing in the United States under a lawful admission for permanent residence, a child automatically derived citizenship from his parent's United States citizenship:

> (a) A child born outside of the United States automatically becomes a citizen of the United States when all of the following conditions have been fulfilled:
>
>> (1) At least one parent of the child is a citizen of the United States, whether by birth or naturalization.
>>
>> (2) The child is under the age of eighteen years.

> (3) The child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence.

8 U.S.C. § 1431(a) (2000).

Second, 8 U.S.C. § 1433 provided that a child born outside the United States but who was physically and temporarily present in the United States pursuant to a lawful admission could derive citizenship if his parent with United States citizenship applied for a certificate of citizenship and certain conditions were fulfilled:

> (a) Application by citizen parents; requirements

> A parent who is a citizen of the United States may apply for naturalization on behalf of a child born outside of the United States who has not acquired citizenship automatically under section 1431 of this title.  The Attorney General shall issue a certificate of citizenship to such parent upon proof, to the satisfaction of the Attorney General, that the following conditions have been fulfilled:

> > (1) At least one parent is a citizen of the United States, whether by birth or naturalization.

> > (2) The United States citizen parent--

> > > (A) has been physically present in the United States or its outlying possessions for a period or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years; or

> > > (B) has a citizen parent who has been physically present in the United States or its outlying possessions for a period or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years.

> > (3) The child is under the age of eighteen years.

> > (4) The child is residing outside of the United States in the legal and physical custody of the citizen parent, is temporarily present in the United States pursuant to a lawful admission, and is maintaining such lawful status.

(b) Attainment of citizenship status; receipt of certificate

> Upon approval of the application (which may be filed from abroad) and, except as provided in the last sentence of section 1448(a) of this title, upon taking and subscribing before an officer of the Service within the United States to the oath of allegiance required by this Act of an applicant for naturalization, the child shall become a citizen of the United States and shall be furnished by the Attorney General with a certificate of citizenship.

8 U.S.C. § 1433 (2000).

For Sotnikov's purposes, only section 1431 could have served as a basis for his derivative citizenship because, according to the allegations in his complaint, Sotnikov was residing in the United States as a lawful permanent resident. Doc. 1 at ¶ 3; 8 U.S.C. § 1431 (applying to children residing in the United States as lawful *permanent* residents); 8 U.S.C. § 1433 (applying to children residing in the United States *temporarily* pursuant to a lawful admission). Sotnikova and Sotnikov, however, concede that Sotnikov has never satisfied section 1431's requirements and that they could obtain the relief they seek only if the Court fashions an equitable remedy. *See* doc. 1 at ¶ 84 ("Plaintiff does not argue he was statutorily eligible for derivative citizenship at the time Mrs. Sotnikova's Application was approved."); *id.* at ¶¶ 1, 80 (seeking, through the doctrine of equitable estoppel, an order compelling Defendants to issue a grant of Sotnikov's July 2022 application); *id.* at ¶¶ 36, 40, (seeking a *nunc pro tunc* issuance of a certificate of citizenship). As explained below, Sotnikov's failure to satisfy section 1431's requirements renders the Court powerless to provide the relief he seeks.

Under 8 U.S.C. § 1421(d), "[a] person may only be naturalized as a citizen of the United States in the manner and under the conditions prescribed in this subchapter and not otherwise." And only "[a] person admitted to citizenship in conformity with the provisions of this subchapter shall be entitled upon such admission to receive from the Attorney General a certificate of naturalization." 8 U.S.C. § 1449; *see also I.N.S. v. Pangilinan*, 486 U.S. 875 (1988) (recognizing

12

that "the power to make someone a citizen of the United States" is "a specific function to be

performed in strict compliance with the terms of an authorizing statute"). "Neither by

application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other

means does a court have the power to confer citizenship in violation of" the statutory limitations.

*Pangilinan*, 486 U.S. at 885.

Granting Sotnikova and Sotnikov the relief they seek would do just that. Sotnikov did

not—and still does not—qualify for derivative citizenship under section 1431. Accordingly, the

Court has no power to compel Defendants to issue Sotnikov a certificate of citizenship.

Several courts have reached the same conclusion. For example, in *Chavarria-Calix v.*

*Attorney General of the United States*, the Third Circuit considered whether it could "exercise

[its] equitable powers to recognize an effective naturalization date for [the petitioner's]

mother, . . . which would, in effect, confer derivative citizenship on" the petitioner. 510 F.

App'x 130 (3d Cir. 2013). The petitioner sought *nunc pro tunc* relief to remedy his alleged

inequities and alternatively asserted "that the government should be equitably estopped from

denying his derivative citizenship due to the lengthy delay in its processing of his mother's

application." *Id.* at 133. Although the petitioner asked the court only to "recognize an

appropriate effective date for his mother's naturalization," the court held that it could not grant

the relief the petitioner sought. *Id.* at 134. If it did so, the petitioner "would obtain citizenship

automatically by operation of law." *Id.* Thus, exercising either equitable estoppel or *nunc pro*

*tunc* relief would, under *Pangilinan*, "constitute an impermissible equity-based departure from

the strict requirements set forth by Congress." *Id.*

Similarly, in *Mustanich v. Mukasey*, the Ninth Circuit considered a petitioner's argument

"that although he did not file an application for naturalization," under section 1433, "prior to the

applicable statutory deadline, the United States is equitably estopped from denying his citizenship because the Government's own affirmative misconduct precluded a timely filing." 518 F.3d 1084, 1085 (9th Cir. 2008). The court rejected this argument: "Estoppel in these circumstances would amount to precisely the type of equity-based departure from the requirements of the immigration statutes that *Pangilinan* prohibits." *Id.* at 1088.

Thus, the Court holds that it lacks the power to grant the relief Sotnikova and Sotnikov seek for their APA and mandamus claims and therefore dismisses those claims.

As Defendants allude to, whether the Court's lack of power requires dismissal under Rule 12(b)(1) for lack of standing or under Rule 12(b)(6) for failure to state claim upon which the Court may grant relief is an open question under Supreme Court and Eighth Circuit precedent. *See* doc. 10 at 11 n.6; *see also Sheppheard v. Morrisey*, 143 F.4th 232 (4th Cir. 2025) ("The redressability requirement of standing ensures that the court has the power to grant the plaintiff's requested relief, and that such relief would remedy the plaintiff's injury. . . . An injury is not redressable if the court is 'powerless to provide the very relief' the plaintiff requests." (first citation omitted) (quoting *K.C. ex rel. Africa H. Shipman*, 716 F.3d 107, 116–17 (4th Cir. 2013)); Fed. R. Civ. P. 12(b)(6) ("[A] party may assert the following defenses by motion: . . . failure to state a claim *upon which relief can be granted*." (emphasis added)).

The Court need not and therefore does not resolve this question for purposes of this order. When a defendant challenges a plaintiff's standing based on the face of a complaint, as Defendants do here, *see* doc. 10 at 11–15, the Court applies the Rule 12(b)(6) standard regardless of whether the issue is raised under Rule 12(b)(1) or Rule 12(b)(6). *Carlsen*, 833 F.3d at 908 ("In a facial attack," under Rule 12(b)(1), "the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion

14

brought under Rule 12(b)(6)." (quoting *Osborn*, 918 F.2d at 729). Thus, regardless of which rule—and which concomitant analysis—governs, the result is the same here: the Court must dismiss the APA and mandamus claims for lack of power to grant the remedy sought.

**B.      Sotnikova's and Sotnikov's constitutional claims**

Although *Pangilinan* forecloses the equitable relief Sotnikova and Sotnikov seek regarding their APA and mandamus claims, *see supra* Section III.A, some courts have concluded that *Pangilinan* doesn't foreclose the Court's remedying of constitutional violations. The Supreme Court, for example, has concluded that federal courts have the power to address the constitutionality of citizenship statutes, *see Miller v. Albright*, 523 U.S. 420 (1998); *Nguyen v. I.N.S.*, 533 U.S. 53 (2001); *Sessions v. Morales-Santana*, 582 U.S. 47 (2017), despite several Supreme Court Justices expressing skepticism that the Court had power grant the ultimate relief sought—namely, the conferral of citizenship, *Nguyen*, 533 U.S. at 73–74 (Scalia, J., concurring); *Morales-Santana*, 582 U.S. at 78 (Thomas, J., with whom Alito, J. joins, concurring in the judgment part). And other courts, primarily the Ninth Circuit, have concluded that courts have the power to remedy "a constitutional claim based on the underlying governmental conduct." *Brown v. Holder*, 763 F.3d 1141, 1149 (8th Cir. 2014). Doubt exists whether courts have the power to confer citizenship under the text of the Constitution and post-*Pangilinan*. But based on *Miller*, *Nguyen*, and *Morales-Santana*, the Court assumes without deciding that it has the power to address Sotnikova's and Sotnikov's claims of constitutional violations. The Court addresses in turn their due-process claims and equal-protection claims.

**i.      Due-process claims**

In count three, Sotnikova asserts a claim under the Due Process Clause of the Fifth Amendment, doc. 1 at ¶¶ 142–53, arguing that she "had a constitutionally protected interest in

applying for naturalization," *id.* at ¶ 147, and that Defendants violated that interest by delaying the adjudication of her application, *id.* at ¶¶ 152–53. Similarly, Sotnikov raises a due-process claim premised on Defendants' alleged delay in adjudicating Sotnikova's application. *Id.* at ¶¶ 160–69.

Under the Fifth Amendment, "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "[A] liberty interest protected by the Due Process Clause of the Fifth Amendment may arise from two sources—the Due Process Clause itself and laws of the United States." *Muhammad v. Carlson*, 845 F.2d 175, 177 (8th Cir. 1988) (first citing *Hewitt v. Helms*, 459 U.S. 460 (1983); and then citing *Bell v. Wolfish*, 441 U.S. 520 (1979)). The Court assumes without deciding that Sotnikova and Sotnikov have proved that they have protectable interests under the Due Process Clause. And it now turns to whether Defendants unconstitutionally violated those interests.

Sotnikova's and Sotnikov's due-process claim hinges upon their belief that the INS intentionally did not timely decide Sotnikova's application under 8 C.F.R. § 335.3 and one of its internal policies. *See* doc. 1 at ¶¶ 131–41, 163, 175; doc. 13 at 27–29. The record and relevant law bely their belief.

Under 8 C.F.R. § 335.3, the INS had to issue "[a] decision to grant or deny the application . . . within 120-days after the date of the initial examination of the applicant for naturalization." 8 C.F.R. § 335.3(a) (1995). The INS could also extend this time frame to issue a decision: "Rather than make a determination on the application, the Service officer may continue the examination on an application for one reexamination, to afford the applicant an opportunity to overcome deficiencies on the application that may arise during the examination." 8 C.F.R. § 335.3(b). Under section 335.3(b), the applicant cannot "be required to appear for a

reexamination earlier than 60 days after the first examination," but "the reexamination on the continued case" had to "be scheduled within the 120-day period after the initial examination. *Id.* Further, the INS allegedly had an internal policy providing that the INS would "adjudicate an application to determine eligibility for any derivative children soon to reach the age of eighteen in less than sixty (60 days)" and provide "[i]mmediate priority" to "children approaching their eighteenth birthday." *Id.* at ¶ 55 (emphases omitted).

Here, Sotnikova's first examination occurred on February 7, 2001.  Doc. 1 at ¶ 53.  Then, on May 2, 2001, Sotnikova's file was transferred to a local office for purposes of having a second examination scheduled.  *Id.* at ¶¶ 66, 69; doc. 1-8.  The parties have not pointed to anything indicating that a second examination was scheduled, and Sotnikova's application-adjudication processing worksheet lacks any indication that Sotnikova "[a]ppeared" for a second examination.  *See* doc. 1-4 at 2.  Viewing the facts in the light most favorable to Sotnikova and Sotnikov, *Lustgraaf*, 619 F.3d at 872–73, the Court infers that within the 120-day window following Sotnikova's first examination, a second examination was not scheduled and as a result, Sotnikova did not appear for a second examination, doc. 1 at ¶¶ 53, 66, 69; doc. 1-4.  In light of these circumstances, section 335.3(a) required Defendants to render a decision on Sotnikova's application by June 7, 2001 (120 days after Sotnikova's initial examination). *See* doc. 1 at ¶¶ 53, 66, 69; doc. 1-4.

Defendants, however, did not render a decision until July 31, 2001, at which time it approved Sotnikova's application.  Doc. 1 at ¶ 72; doc. 1-4 at 2.  Sotnikova's application-adjudication processing worksheet notes that on that date, the INS officer received Sotnikova's "A" file and that Sotnikova "[e]stablished good moral character," a requirement that an applicant must meet before her naturalization application can be approved.  Doc. 1-4 at 2; *see*

8 C.F.R. § 316.10.  Based on the worksheet, the Court infers that the INS officer could not render a decision on June 7, 2001, (unless the officer denied the application) because the officer didn't have the A file and therefore couldn't determine whether Sotnikova satisfied the good-moral-character requirement.  Doc. 1-4 at 2; *see* 8 C.F.R. § 316.10.

Sotnikova and Sotnikov argue that these circumstances constituted a due-process violation because the INS failed to adhere to section 335.3 and to one of its internal policies. Doc. 1 at ¶¶ 163, 175; doc. 13 at 24.  Sotnikova and Sotnikov, however, have not identified—nor has the Court found—any caselaw supporting the proposition that Defendants' conduct rose to the level of a due-process violation.  Instead, they rely on *Brown v. Holder*, 763 F.3d 1141 (9th Cir. 2014).

In *Brown*, a person in removal proceedings claimed that he "should be deemed a United States citizen, because" the INS "had wrongly prevented him from deriving citizenship through his parents and then from applying for citizenship on his own account."  763 F.3d at 1144. Specifically, he asserted that the INS violated his due-process rights by "fail[ing] to follow its own regulations and internal operating instructions."  *Id.* at 1148 (citation omitted).  The Ninth Circuit *rejected* that assertion:  "'INS Operations Instructions typically do not create substantive rights.'  Therefore, insofar as [the petitioner] relies only on the supposed failure of the INS to follow its regulations and operating procedures, his claim fails."  *Id.* at 1148–49 (first quoting *Abboud v. INS*, 140 F.3d 843, 848 (9th Cir. 1998); and then citing *United States v. Tatoyan*, 474 F.3d 1174, 1178 (9th Cir. 2007)).  The court then explained that the petitioner may "be able to state a constitutional claim based on the underlying government conduct."  *Id.* at 1149 (premising this proposition on *Pangilinan*'s consideration of a due-process claim and explaining that the Court "has not set out what degree of government misconduct will suffice for a

constitutional violation in this context, and [it] and other circuit courts have not either"). The court then transferred the case to a district court for consideration of whether "the INS arbitrarily and intentionally obstructed [the petitioner's] application" or was "deliberately indifferent to whether his application was processed." *Id.* at 1150.

Sotnikova and Sotnikov claim that the circumstances of the INS's consideration of Sotnikova's application satisfy the standard that *Brown* set forth. Doc. 13 at 27–29. Even assuming that the *Brown* standard is the correct standard for considering the government's conduct in relation to a due-process claim in this context, Defendants' conduct didn't rise to the level of "arbitrarily and intentionally obstruct[ing]" Sotnikova's application or being "deliberately indifferent to whether [her] application was processed." *Brown*, 763 F.3d at 1150. As described above, the INS largely considered Sotnikova's application within the time frame set forth in its regulations; the delay that occurred resulted from the fact that the INS offer couldn't conclude that Sotnikova had met the good-moral-character requirement until July 31, 2001; and as soon as the INS officer could reach that conclusion, the officer approved Sotnikova's application.

Further, the Court notes that, in 2001, 8 U.S.C. § 1447(b) provided that:

> If there is a failure to make a determination under section 1446 of this title before the end of the 120-day period after the date on which the examination is conducted under such section, the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter.

Based on the facts of this case, Sotnikova had between June 8, 2001, and July 22, 2001—a 55-day window—*before* Sotnikova aged out of section 1431 derivative citizenship to seek relief under section 1447(b). *See supra* (concluding that the INS was required to render a decision by June 7, 2001); doc. 1 at ¶ 72 (supporting the conclusion that Sotnikov turned 18 on July 23,

2001, eight days before INS approved Sotnikova's application). The complaint doesn't indicate that Sotnikova availed herself of section 1447(b)'s relief before Sotnikov turned 18, *see* doc. 1, and the Court hasn't found any judicial records showing that she did so. In other words, the record lacks any evidence that Sotnikova pursued the remedial avenue that Congress explicitly provided in section 1447(b) for the INS's failure to render a timely decision.

Thus, the Court concludes that Sotnikova and Sotnikov failed to sufficiently plead a due-process claim. Accordingly, the Court dismisses Sotnikova's and Sotnikov's due-process claim.

### ii.        Sotnikova's and Sotnikov's equal-protection claim

Finally, in counts four and six, Sotnikova and Sotnikov each assert an equal-protection claim. Doc. 1 at ¶¶ 154–59, 170–77. Here, too, they premise their claims on largely the same assertions: that Defendants denied her right to the timely adjudication of her application while others' applications were adjudicated in accordance with existing policy and law and that Defendants treated Sotnikova differently because she had a son who had a criminal background. *Id.* The Court construes these claims as asserting claims under the Fifth Amendment. *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 849 (8th Cir. 2014) (explaining that a court "should not" dismiss a claim "merely because a plaintiff's allegations do not support the particular legal theory he advances" (quoting *Bramlet v. Wilson*, 495 F.2d 714, 716 (8th Cir. 1974)); *Bolling v. Sharp*, 347 U.S. 497, 499–500 (1954) (interpreting the Fifth Amendment Due Process Clause as requiring the federal government to provide equal protection).

Upon review of the complaint and its attachments, the Court finds that it lacks allegations supporting the conclusion that Defendants treated Sotnikova and Sotnikov differently because of Sotnikov's criminal history. The complaint alleges that, before the INS approved her

application, Sotnikova informed the INS that her son had an upcoming 18th birthday, that her son was in the custody of a state jail, and that his removal from the United States was "nearly certain" if he didn't receive derivative citizenship.  *See, e.g.*, doc. 1 at ¶¶ 54, 61–62.  Further, it alleges that an INS "[s]pecial [a]gent" reviewed Sotnikov's criminal records twice in February 2001.  *Id.* at ¶ 101.  Although these allegations show that the INS was aware of Sotnikov's criminal history, they do not support the inference that the INS delayed adjudication of Sotnikova's application *because of* Sotnikov's criminal history.  Instead, and as explained above, the complaint's other allegations and attachments show that the delay in the adjudication of Sotnikova's application occurred because the INS could not, until July 31, 2001, conclude that Sotnikova met the good-moral-character requirement.  Thus, the complaint belies the central premise of Sotnikova's and Sotnikov's equal-protection claim—that the INS delayed adjudication of Sotnikova's application because she was the mother of a criminal.

Having found that the alleged facts bely the central premise of their claims, the Court holds that Sotnikova and Sotnikov have both failed to state an equal-protection claim upon which the Court can grant relief and dismisses those claims.

## IV.    Conclusion

For these reasons, the Court grants Defendants' [9] Motion to Dismiss.  A separate order of dismissal accompanies this order.

So ordered this 20th day of August 2025.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE

21